IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| CHRISTOPHER B.,[1] )<br>)<br>*Plaintiff*, )<br>)<br>v. )<br>)<br>MARTIN O'MALLEY, )<br>Commissioner of the )<br>Social Security Administration,[2] )<br>)<br>*Defendant*. )<br>_____ ) | Civil No. 3:23-cv-00283-RCY-SLS |

## REPORT AND RECOMMENDATION

In this action, Plaintiff Christopher B. seeks review of the Commissioner of the Social Security Administration's ("SSA") decision to deny Plaintiff's Title XVI application for Supplemental Security Income ("SSI"). This matter comes before the Court for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment. (ECF Nos. 13, 14.) The motions have been fully briefed (ECF Nos. 13, 14, 15), making this matter ripe for review.

Plaintiff requests that the Commissioner's decision be vacated and remanded for a *de novo* hearing and new decision. (Plaintiff's Brief in Support of a Motion for Summary Judgment (ECF No. 13-1) ("Pl's Mem.") at 13.) As the basis for such relief, Plaintiff argues that the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that federal courts refer to claimants by their first names and last initials in social security cases.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he has been substituted for Acting Commissioner Kilolo Kijakazi as Defendant in this action. No further action need be taken to continue this suit. 42 U.S.C. § 405(g).

Law Judge's ("ALJ") residual functional capacity ("RFC") assessment is not supported by substantial evidence because she improperly evaluated the medical opinion of Therese May, M.D. ("Dr. May"). (Pl.'s Mem. at 8, 13.) The Commissioner responds that the ALJ properly considered and analyzed Dr. May's opinion in accordance with the regulations and requests that the Commissioner's final decision be affirmed. (Defendant's Motion for Summary Judgment and Brief in Support Thereof (ECF No. 14) ("Def's Mem.") at 14.)

For the reasons set forth below, the ALJ complied with applicable regulations in assessing the medical opinion, and substantial evidence supports the ALJ's RFC determination. Therefore, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed the current application for SSI benefits on February 5, 2018. (Administrative Record ("R.") at 15, 157.)[3] He initially alleged an onset of disability as of February 1, 2012, but later amended the onset date to February 5, 2018. (R. at 15, 38.) In his application, Plaintiff alleged that he suffered from bipolar disorder, manic depressive disorder, and depressive type schizoaffective disorder. (R. at 139-40.) The SSA denied Plaintiff's claim initially and upon reconsideration. (R. at 157, 177.) Plaintiff requested a hearing before an ALJ, and one was held on July 24, 2019. (R. at 33-80, 193.)

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for the year of birth), and financial account numbers from this Report and Recommendation. The Court will further restrict its discussion of Plaintiff's medical information to the extent necessary to result in a proper analysis of the case.

2

On October 8, 2019, the ALJ issued a decision finding that Plaintiff had not been under a disability since February 5, 2018. (R. at 15-25.) The Appeals Council denied Plaintiff's request for review. (R. at 1-3.) Plaintiff initiated a prior civil action seeking judicial review of the Commissioner's decision. *Christopher B. v. Kijakazi*, Case No. 3:20-cv-782-HEH (E.D. Va. filed Oct. 7, 2020). (R. at 790-92.) On September 13, 2021, this Court remanded the case following a Consent Motion to Remand from the Commissioner. (R. at 799.) On remand, the Appeals Council ordered the ALJ to further consider: (1) Dr. May's medical opinion, specifically the factors of supportability and consistency; and (2) the prior administrative findings of state agency psychological consultants. (R. at 803-05.)

A hearing on remand was held on September 14, 2022. (R. at 716-65.) On October 6, 2022, the ALJ issued her decision, finding that Plaintiff was not disabled from February 5, 2018 through the date of decision. (R. at 695-708.) On March 22, 2023, the Appeals Council denied Plaintiff's request for review. (R. at 685-88.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. STANDARD OF REVIEW

The Social Security Act ("the Act") defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423 (d)(2)(A).

SSA regulations set forth a five-step process to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).  At step one, the ALJ must review the claimant's current work activity to determine if he has been participating in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  At step two, the ALJ must ask whether the claimant's medical impairments meet the regulations' severity and duration requirements.  *Id.* § 416.920(a)(4)(ii).  At step three, the ALJ must determine whether the medical impairment(s) meet or equal an impairment listed in the regulations.  *Id.* § 416.920(a)(4)(iii).  Between steps three and four, the ALJ must determine the claimant's RFC, which accounts for the most that the claimant can do despite his impairments.  *Id.* § 416.925(a).

At step four, the ALJ must assess whether the claimant can perform his past employment given his residual functional capacity.  *Id.* § 416.920(a)(4)(iv).  The burden of proof remains with the claimant through step four of the analysis, and he must prove that his limitations preclude him from performing his past relevant work.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).  If such past work can be performed, then benefits will not be awarded, and the analysis ends.  *See* 20 C.F.R. § 416.920(e).  However, if the claimant cannot perform his past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant can perform other work that is available in the national economy.  *See id.* § 416.920(a)(4)(v).  The Commissioner usually offers this evidence through the testimony of a vocational expert ("VE").  *See Mascio*, 780 F.3d at 635.

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'"  *Mascio*, 780 F.3d at 634 (quoting *Bird v.*

4

*Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion.  *See Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  The substantial evidence standard "presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts."  *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).  Thus, a decision by the Commissioner is not subject to reversal merely because substantial evidence would have supported a different conclusion.  *Id.*

To determine whether substantial evidence exists, the court must examine the record as a whole but may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]."  *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see Craig*, 76 F.3d. at 589.  The Court must consider the support for the Commissioner's decision and "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  If a fact is supported by substantial evidence, the reviewing court must affirm, regardless of whether the court agrees with such findings. *Hancock*, 667 F.3d at 476 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)).  If the Commissioner's findings are arbitrary or unjustified, then they are not supported by substantial evidence, and the reviewing court must reverse the decision.  *See Breeden*, 493 F.2d at 1007.

### III. THE ALJ'S DECISION

The ALJ analyzed Plaintiff's disability claim in accordance with the five-step evaluation process. (R. at 695-708.)  *See* 20 C.F.R. § 416.920(a)(4); *Mascio*, 780 F.3d at 634.  At step one,

the ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 5, 2018. (R. at 698.) At step two, the ALJ determined Plaintiff suffered from the following severe impairments: schizoaffective disorder, bipolar disorder, alcohol use disorder, cannabis use disorder, and cocaine use disorder. (R. at 698-99.) At step three, the ALJ determined that Plaintiff did not have an impairment, individually or in combination, which met or medically equaled a disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 699-701.)

The ALJ explained that she determined Plaintiff's RFC after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p." (R. at 701.) Based on the evidence in the record, the ALJ found that Plaintiff retained the ability to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> [Plaintiff] can understand, remember, and carry out simple and routine work-related instructions, and concentrate for periods of two hours on work-related tasks before requiring a break. He can perform low-stress jobs, defined as jobs not performed at an assembly line pace, with few workplace changes, little independent decision making and no responsibility for the safety of others. He can interact with supervisors and coworkers occasionally, but he should never interact with the public. In addition to normal breaks, [Plaintiff] will be off task five percent of time in an 8-hour workday due to psychological symptoms.

(R. at 701.)

In arriving at the RFC, the ALJ first considered Plaintiff's testimony regarding the intensity, persistence, and functionally limiting effects of his symptoms. (R. at 701.) Plaintiff testified that his conditions caused auditory and visual hallucinations and mood swings, could make him very angry and irritable, and that he occasionally struggled to differentiate between his hallucinations and reality. (R. at 702, 737-40.) Plaintiff testified to seeing "little short black figures like of a gnome" around twenty days a month, even with medication. (R. at 737-38, 740-

41.) He testified that he does not get along well with others and has been involved in multiple altercations or situations where he "snapped." (R. at 702, 740-42, 751, 754.) Plaintiff said that the medication he takes for his conditions make him feel sedated, dizzy, overheated, and gives him brain fog. (R. at 702, 751.) He noted that his memory remained "pretty good" but stated he could not pay attention for very long at once. (R. at 702, 751.) He testified to sleeping thirteen hours a day. (R. at 702, 744.)

The ALJ found Plaintiff's statements about "the intensity, persistence and limiting effects of these symptoms . . . not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 702.) The ALJ then undertook a review of the medical evidence, analyzed Plaintiff's daily activities, and assessed medical opinion evidence. (R. at 702-06.)

The ALJ acknowledged Plaintiff's diagnoses of schizoaffective disorder, bipolar disorder, and substance use disorders. (R. at 702.) Plaintiff "received relatively regular treatment for his impairments, consisting mainly of oral medications and therapy sessions." (R. at 703.) Overall, Plaintiff reported doing well with that treatment. (R. at 703.) Treatment records show that, "[a]t times," Plaintiff's impairments caused "disturbances in [Plaintiff's] mood and affect, or mild deficits in attention, insight, or judgment," and "[o]n a few occasions," Plaintiff "appeared disheveled or grandiose." (R. at 702.) For example, while under evaluation in June 2022, Plaintiff "appeared guarded, irritable, distracted, disheveled, and anxious, and he was slow to respond to questions. His thinking was tangential, his reasoning illogical and delusional, and his attention span short." (R. at 702.) At the same time, he remained calm and cooperative, his mood and affect remained normal, his memory and cognitive functioning remained intact, and his behavior was unremarkable. (R. at 702.) More often though, treatment providers do not describe similar

7

abnormalities, and while Plaintiff does describe persistent hallucinations, clinicians typically note that he does not appear to respond to internal stimuli. (R. at 702.) Otherwise, "clinicians routinely note that [Plaintiff's] attention, concentration, memory, and thoughts are intact." (R. at 703.)

The ALJ also considered records regarding two hospital stays. In November 2018, Plaintiff received emergency treatment for suicidal and homicidal ideation and on examination appeared paranoid and irritable with some psychomotor agitation. (R. at 702.) Plaintiff admitted that he had not taken his medications for a few days and that his medications helped control his symptoms. (R. at 702.) Following a three-day hospital stay, Plaintiff was released with a normal mental status examination. (R. at 702-03.)

About four years later, in May 2022, Plaintiff was again hospitalized, this time for a week. (R. at 703.) He arrived at the hospital with suicidal thoughts and hallucinations, irritable mood, pressured speech, psychomotor agitation, and a tangential, perseverative, delusional thought process. (R. at 703.) On arrival, Plaintiff required restraint and intramuscular antipsychotics and benzodiazepines, but following adjustment of his medications, his condition improved rapidly. (R. at 703.) At discharge, his examination was largely normal aside from profuse speech, mild psychomotor agitation, and an irritable affect. (R. at 703.) Plaintiff received additional community stabilization in June 2022 because he was not taking his medication. (R. at 703.)

Thus, Plaintiff required two hospitalizations in more than a four-year period between the application date and the ALJ's decision. (R. at 703.) "[T]he first of these hospital stays occurred when he was not taking medications, and the second occurred when he required medication adjustment. Likewise, following his second hospital stay, he required brief stabilization services, but again, he was not taking his medications." (R. at 703.) The ALJ found that other than those few interventions, Plaintiff's "symptoms have been well managed with conservative care." (R. at

703.) The ALJ also considered Plaintiff's statements regarding his daily activities. Plaintiff could "care for his personal needs, prepare simple meals, shop, go to the library, and read for pleasure." (R. at 703.) In addition, he stated he could "do his own laundry" and do chores. (R. at 703.)

The ALJ found that while Plaintiff experiences symptoms related to his impairments, "the objective findings contained in the record, the conservative care he has received, his statements to providers for treatment purposes, and his admitted ability to complete a variety of daily tasks suggest that these symptoms are not as severe or as limiting as he claims." (R. at 703-04.) Ultimately, in fashioning the RFC, the ALJ concluded that Plaintiff's "impairments prevent him from preforming complex, fast-paced work activities, and further affects his abilities to make decisions, tolerate workplace changes, interact with others, be responsible for the safety of others, and remain on task." (R. at 702.)

The ALJ also considered "the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c." (R. at 701.) In a previous decision dated November 30, 2012, the ALJ concluded that Plaintiff had the RFC "to perform work at all exertional levels except he can perform only simple, routine, and repetitive tasks that involve only occasional interaction with the public, coworkers, and supervisors." (R. at 701.) The ALJ afforded this previous opinion "some weight," as the evidence shows Plaintiff's RFC has changed since that time and additional medical evidence has documented Plaintiff's difficulties "completing fast-paced tasks, tolerating changes, remaining on task, and interacting with the public." (R. at 701.)

The ALJ considered the opinion of Louis Perrott, Ph.D. ("Dr. Perrott"), a state agency reviewing psychologist. (R. at 704.) Dr. Perrott found that Plaintiff could "usually understand and follow simple one to two-step instructions and sustain mental focus sufficient for completing

9

simple, routine tasks[,]" had "some problems with attention and concentration, but he remain[ed] capable of understanding, remembering, and carrying out simple instructions and making simple work-related decisions[,]" and could "deal with ordinary changes in a routine, low-stress work setting requiring no public contact." (R. at 704.) The ALJ found Dr. Perrott's opinion generally persuasive, as it was largely consistent with the evidence of record and supported by explanations. (R. at 705.)

The ALJ found Dr. Perrott's opinion partially consistent with the evidence, as Plaintiff's "memory and cognitive function are typically intact," and he could prepare simple meals, shop, manage his own finances, and read for pleasure, which all "require[d] him to follow instructions or procedures, remain on task, remember information, and maintain some degree of attention and concentration." (R. at 704.) This suggests that he can "complete simple work activities and sustain concentration for such tasks for periods of two hours before he requires a break," and "that he can remain on task for all but five percent of the workday." (R. at 704.) Dr. Perrott acknowledged that "intermittent deficits" in Plaintiff's "concentration, insight, and judgment" along with "sporadic abnormalities in [Plaintiff's] thought processes" would affect Plaintiff's ability to tolerate workplace stress, but the ALJ noted that Plaintiff's concentration and thought processes were often normal during psychological examinations. (R. at 704.) Furthermore, Plaintiff's activities of daily living indicated that he could work at an appropriate pace, adjust to changes, and make decisions, but should not work at a production pace, encounter too many workplace changes or independent decision-making scenarios, and should not be responsible for the safety of others. (R. at 704.)

Further, the ALJ noted that Plaintiff consistently stated that he has trouble getting along with others. (R. at 704.) Dr. Perrott indicated that abnormalities in Plaintiff's mood and affect

10

along with his intermittent speech and psychomotor abnormalities would "limit his capacity to interact with others in the workplace." (R. at 704.) However, other clinicians noted that he was "pleasant" at times, and was able to spend time with his girlfriend, shop, and go to the library, all of which suggested Plaintiff "can interact with supervisors and coworkers occasionally, but given his irritability, he should never be required to interact with the public." (R. at 704-05.)

Next, the ALJ considered the opinion of Joseph Leizer, Ph.D. ("Dr. Leizer"), a state agency reviewing psychologist. (R. at 705.) Dr. Leizer found that Plaintiff could "recall short, simple instructions, and perform familiar, routine procedures" but "may have occasional problems maintaining attention, and he might need prompting to refocus." (R. at 705.) He further noted that Plaintiff could interact appropriately with supervisors and coworkers, but was easily distracted by others, so it would be best to work in an environment with only a few co-workers, and that Plaintiff should only have brief periods of interaction with the public. (R. at 705.) The ALJ found Dr. Leizer's opinion not entirely consistent with the evidence because "there is no indication that [Plaintiff] will struggle to maintain attention on an occasional basis or that he will require prompting to refocus" as "treatment providers usually do not indicate that he struggles to sustain focus or must be redirected during appointments." (R. at 705.) Furthermore, because Plaintiff can shop, go to the library, and interact appropriately during medical appointments, the ALJ found that he would likely be able to interact appropriately with supervisors and coworkers in a work setting on an occasional basis. (R. at 705.) The ALJ concluded that there is no evidence showing that Plaintiff would struggle adhering to a routine or maintaining concentration for a full workday. (R. at 705.) The ALJ found Dr. Leizer's opinion unpersuasive because Dr. Leizer did not fully support his opinion with explanations, his opinion is not entirely consistent with medical evidence, and additional evidence had been submitted since Dr. Leizer's review. (R. at 705.)

The ALJ also considered the opinion of Dr. May, who examined Plaintiff in August 2018 at the agency's request. (R. at 705-06.) Dr. May opined that Plaintiff could:

> understand simple, repetitive tasks, but he will have a limited ability to perform such tasks on a sustained basis. His symptoms will negatively affect his ability to maintain attendance and perform consistently in the workplace. He might have trouble accepting instructions from supervisors, and interacting with supervisors, coworkers, and the public. He will probably decompensate under the stress of competitive work.

(R. at 705.)

The ALJ found this opinion largely inconsistent with the evidence, which showed Plaintiff could "perform simple work activities on a sustained basis and interact with supervisors and coworkers occasionally for the reasons previously discussed." (R. at 705.) In addition, Plaintiff's ability to handle his own medical care, follow his treatment providers' recommendations, and attend regular appointments suggest he could follow instructions without difficulty and attend work. (R. at 705-06.) The ALJ also found that Plaintiff did not show a "specific increase in objective mental status abnormalities during periods of increased stress or change," implying that he should be able to work without decompensating. (R. at 706.)

The ALJ also found Dr. May's opinion unsupported by her own examination report or her "objective observations of [Plaintiff's] functioning." (R. at 706.) Her report noted that Plaintiff appeared tense and anxious, his grooming and hygiene were not meticulous, though he was not disheveled, and his speech was pressured, but logical and understandable. (R. at 703.) While Plaintiff "struggled to complete some tasks designed to measure attention, concentration, and memory, . . . he performed others without difficulty." (R. at 703.) In addition, "[w]hile his fund of knowledge and judgment were limited, his thought processes were logical and goal-directed." (R. at 703.) Plaintiff also did not appear paranoid or delusional. (R. at 706.) The ALJ found Dr. May's opinion unpersuasive. (R. at 706.)

After completing the RFC assessment, the ALJ found at step four that Plaintiff could perform his past relevant work as a kitchen helper. (R. at 706.) The VE testified that a "person of the same age, education, and work history as [Plaintiff], with the limitations described, would be able to perform the duties required of a kitchen helper," and the ALJ found no reason to disagree or reject the VE's testimony. (R. at 706.) Additionally, the VE testified that given Plaintiff's age, education, work experience, and RFC, he would be able to perform the jobs of inspector grader, institutional night cleaner, or table worker. (R. at 707.) The ALJ adopted the VE's testimony and found in the alternative at step five that Plaintiff could make a successful adjustment to and perform other work that exists in significant numbers in the national economy. (R. at 708.) The ALJ determined that Plaintiff had not been under a disability as defined by the Act since February 5, 2018. (R. at 708.)

## IV. ANALYSIS

In reviewing the Commissioner's decision to deny Plaintiff's application, the Court must determine whether: (1) the ALJ has applied the correct legal standards; and (2) the ALJ's findings are supported by substantial evidence. *Mascio,* 780 F.3d at 634 (citing *Bird*, 699 F.3d at 340). "In reviewing for substantial evidence, [a court must not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel,* 270 F.3d 171, 176 (4th Cir. 2001). Consequently, as long as the judgment is explained and supported by substantial evidence, this Court must accept the Commissioner's decision, even if this Court would reach an opposite conclusion or weigh the evidence differently if it were conducting a *de novo* review of the record. *See Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990); *Rhyne v. Astrue,* No. 3:09-cv-412, 2011 WL 1239800, at *3 (W.D.N.C. Mar. 30, 2011).

For the reasons that follow, this Court finds that the ALJ properly assessed the medical opinion evidence in accordance with the regulations, and substantial evidence supports the ALJ's RFC determination.

### A. Evaluating Medical Opinion Evidence for Claims Filed on or After March 27, 2017

Claims involving medical opinion evidence filed on or after March 27, 2017, are evaluated using a revised regulatory framework. This framework applies in Plaintiff's case. (R. at 698; Pl.'s Mem. at 8-9.) *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. § 416.920c. The revised regulations provide that the ALJ will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . ." *Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; *see* 20 C.F.R. § 416.920c. Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources, no matter the source. 20 C.F.R. § 416.920c(a).

Under the regulations, the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict a medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. *Id*. § 416.920c(b)-(c). Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered in the decision. *Id*. § 416.920c(b)(2). The regulations define supportability and consistency as follows:

> (1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her

14

>medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
>(2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

*Id.* § 416.920c(c)(1)-(2). The ALJ may, but is not required to, explain how the other factors were considered. *Id.* § 416.920c(b)(2).

### B. Dr. May's Opinion

Dr. May met with Plaintiff on August 1, 2018. (R. at 437.) Plaintiff appeared for their meeting on time and alone. (R. at 437.) Dr. May noted that Plaintiff even "called the day before to make sure he knew the bus routes and got himself there on time." (R. at 439.) She described Plaintiff's affect as "tense and anxious." (R. at 438.) Plaintiff had a causal appearance, and Dr. May noted his grooming and hygiene as "not meticulous" but not disheveled, with a trimmed beard and shaved head. (R. at 438.)

Plaintiff appeared "alert and oriented to person, place, and date." (R. at 438.) He proved to be a "detailed and adequate historian" (R. at 438), able to recall his medical and personal history. (R. at 437.) Dr. May described Plaintiff's speech as "rapid but logical and goal directed and understandable" and "pressured but articulate." (R. at 438-39.) His thought processes were "logical and goal directed with no bizarreness noted." (R. at 438.) Testing demonstrated fair attention and concentration, fairly good insight, a limited fund of knowledge, and limited judgment. (R. at 438-39.) According to Dr. May, Plaintiff's "persistence and motivation currently appear good." (R. at 439.) Plaintiff maintained good eye contact during the examination, was talkative, and related with Dr. May in a "pleasant and frank fashion." (R. at 439.)

Dr. May noted that, according to Plaintiff, "he is easily frustrated" and "talks fast, gets confused and loud and people do not understand him" during manic episodes. (R. at 437.) He stated he becomes suicidal or paranoid under stress. (R. at 438.) Plaintiff also described keeping to himself and feeling moderate anxiety with no full-blown panic attacks. (R. at 438-39.) Plaintiff reported that "his medicines help 'sometimes' but that there is 'no magic pill.'" (R. at 438.) He reported having "transient breakthrough visual and auditory hallucinations, but they are better on his medication." (R. at 438.) Dr. May described Plaintiff as able to "manage activities of daily living at a low level" (R. at 440), including performing self-care, taking medication, doing laundry, cooking using the microwave, listening to music, watching television, managing his medical appointments, and managing his funds (R. at 439, 440).

Dr. May concluded:

> [Plaintiff] is seen as having the capacity to understand simple and repetitive tasks. His ability to perform such tasks on a sustained basis appears to be impaired by chronic psychotic illness and mood instability. These symptoms would negatively affect his ability to maintain attendance to perform consistently in the work place. His chronic psychiatric illness may result in him having difficulty accepting instructions from supervisors given that he can become paranoid and aggressive under stress. His ability to interact with supervisors, coworkers, the public is seen as moderately impaired. [Plaintiff] has a chronic illness involving both emotional dyscontrol and psychotic symptomatology. He is seen as likely to decompensate under the stresses of competitive work.

(R. at 439.)

### C. The ALJ Applied Correct Legal Standards in Evaluating Dr. May's Opinion, and Substantial Evidence Supports the ALJ's Determinations

Plaintiff argues that the RFC determination was not supported by substantial evidence because the ALJ improperly rejected Dr. May's opinion evidence. (Pl.'s Mem. at 8.) Specifically, Plaintiff argues that the ALJ failed to explain how the factors of supportability and consistency led

her to label Dr. May's opinion as unpersuasive. (Pl.'s Mem. at 9-12.) Review of the record shows otherwise.

Regarding consistency, the ALJ found discrepancies between Dr. May's evaluation and other medical evidence on file. (R. at 705-06.) Specifically, the ALJ explained that Dr. May's conclusions were "largely inconsistent with the evidence, which shows that [Plaintiff] is able to perform simple work activities on a sustained basis and interact with supervisors and coworkers occasionally" for reasons discussed elsewhere in the decision. (R. at 705.) The ALJ had previously summarized Plaintiff's treatment history, mental status examinations, statements to treatment providers, and activities of daily living. (R. at 702-04.) *See Todd A. v. Kijakazi*, No. 3:20cv594-DJN, 2021 WL 5348668, at *4 (E.D. Va. Nov. 16, 2021) (finding that the ALJ's opinion must be read as a whole). Plaintiff required hospitalization on two occasions over a four-year period because he failed to take his medications or needed medication adjustment. Otherwise, Plaintiff reported doing well with medications and therapy sessions. While records showed mild deficits in attention, insight, or judgment or disturbances in mood or affect on occasion, treatment records routinely failed to describe similar abnormalities and instead noted Plaintiff's attention, concentration, memory, and thoughts as intact. In addition, Plaintiff stated he could care for his personal needs, prepare simple meals, do laundry, shop, go to the library, and read for pleasure, among other activities.[4]

---

[4] Plaintiff correctly notes that an ALJ cannot consider the type of activities performed by a claimant without also considering the extent to which these activities can be performed. (Pl.'s Mem. at 11 (citing *Oakes v. Kijakazi*, 70 F.4th 207, 216 (4th Cir. 2023).) The record, however, does not suggest that the ALJ failed to bear this standard in mind or otherwise mischaracterized the extent to which Plaintiff could perform such activities.

17

Plaintiff's ability to manage his own medical care, follow treatment recommendations, attend medical appointments,[5] and endure stressors or changes without exhibiting an increase in objective mental status abnormalities[6] all indicate Plaintiff can maintain attendance at a low-stress job with few workplace changes, interact with supervisors and coworkers on occasion, and follow simple and routine workplace instructions. (R. at 705-06.) Thus, the ALJ concluded that Plaintiff's "impairments prevent him from performing complex, fast-paced work activities, and further affects his abilities to make decisions, tolerate workplace changes, interact with others, be responsible for the safety of others, and remain on task." (R. at 702.)

As for the supportability factor, the ALJ found Dr. May's opinion unsupported by her own examination notes. (R. at 706.) The ALJ referenced juxtapositions between Dr. May's notes regarding Plaintiff's limitations and his abilities, his thought processes, and his completion of tests:

---

[5] Plaintiff argues that attendance at regular medical appointments does not translate to workplace attendance. (Pl.'s Mem. at 10.) Plaintiff cites *Robert B. v. Kijakazi*, No. 22-2411-BAH, 2023 WL 5299474 (D. Md. Aug. 17, 2023) to support this argument. (Pl.'s Mem. at 10.) In *Robert B.*, the ALJ relied on claimant's ability to care for his personal needs, attend medical appointments, and go grocery shopping as relating to the claimant's lifting and carrying abilities. *Id.* at *3. The court found that those activities of daily living "shed[] no light on whether [the claimant's] statement regarding his lifting and carrying abilities w[ere] credible" and without more, the ALJ failed to build a logical bridge between the evidence and lifting and carrying restrictions. *Id.* Here, however, the ALJ did not rely solely on Plaintiff's attendance record for medical appointments in arriving at the RFC. The ALJ also considered Plaintiff's testimony, treatment records, objective findings, Plaintiff's activities of daily living, and medical opinion evidence. Moreover, the ALJ explained how such evidence translates to the restrictions included in the RFC.

[6] Plaintiff asserts that this is a mischaracterization of the evidence because Dr. May observed rapid speech, reported that Plaintiff can become paranoid under stress, and discussed Plaintiff's chronic illness involving both emotional dyscontrol and psychotic symptomology. (Pl.'s Mem. at 11-12.) The record, however, shows that Plaintiff has maintained largely normal mental status examinations on an outpatient treatment regimen, with two hospitalizations over a four-year period stemming from failing to take medication or needed medication adjustment. (*See* R. at 389, 397, 410-11, 465, 493-94, 605, 610, 914, 919-23, 933, 974, 984, 1016, 1094). Thus, substantial evidence supports the ALJ's conclusion that Plaintiff has not shown a "specific increase in objective mental status abnormalities during the periods of increased stress or change." (R. at 706 (internal record citations omitted).)

> Th[e] report notes that [Plaintiff] appeared tense and anxious with some abnormalities in grooming and hygiene, pressured speech, limited judgment and fund of knowledge, and deficits in attention, concentration, and memory. However, Dr. May also indicates that he was able to take the bus to the appointments independently, his thoughts were logical and goal-directed, he did not appear paranoid or delusional, and he was capable of completing some tasks designed to measure attention, concentration, and memory.

(R. at 706.) The ALJ also noted that Dr. May "appear[ed] to base her opinion at least in part on [Plaintiff's] statements concerning his symptoms, rather than her objective observations of his functioning." (R. at 706.) Thus, the ALJ adequately explained how she considered the factor of supportability, and the Court declines to reweigh the evidence considered by the ALJ. *See Hancock*, 667 F.3d at 472.

The ALJ sufficiently explained the factors of supportability and consistency in her analysis of Dr. May's opinion and tied the evidence to the record. The ALJ's explanations allow for a meaningful review, and her conclusions find substantial support in the record. Therefore, the Court finds no error warranting remand.

## V. CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable United States District Judge Roderick C. Young and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right**

**to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                        /s/

                                            Summer L. Speight
                                            United States Magistrate Judge

Richmond, Virginia
Date: June 5, 2024